**United States District Court**
For the Northern District of California

1
2
3
4           IN THE UNITED STATES DISTRICT COURT
5          FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7   MICHAEL IZELL SEALS,                    )   No. C 04-1569 SBA (PR)
                                            )
8              Plaintiff,                    )   **ORDER GRANTING DEFENDANTS'**
                                            )   **MOTIONS FOR SUMMARY JUDGMENT**
9       v.                                   )   **AND ADDRESSING PENDING MOTIONS**
                                            )
10  OFFICER JOHN RUSSELL, et al.,           )
                                            )   (Docket nos. 87, 103, 105, 106, 111, 120, 125,
11             Defendants.                   )   126, 129, 152, 153, 157)
                                            )
12  ─────────────────────────────────────
13                    **INTRODUCTION**
14
15          Plaintiff Michael Izell Seals, a state prisoner currently incarcerated at San Quentin State

16  Prison (SQSP), filed the instant pro se civil rights complaint under 42 U.S.C. § 1983, alleging

17  multiple causes of action for violations that occurred during his pretrial detention at the Lake County

18  Jail.  These causes of action include:  use of excessive force against Plaintiff; deliberate indifference

19  to his serious medical needs; denial of due process with regard to his April 27, 2003 disciplinary

20  hearing and his housing in maximum security; retaliation; and supervisory liability.  The served

21  Defendants denied all allegations and filed motions for summary judgment on grounds that the

22  uncontested facts preclude liability.

23
24          For the reasons discussed below, the Court GRANTS the served Defendants' motions for

25  summary judgment.

26                  **PROCEDURAL BACKGROUND**

27          On April 21, 2004, Plaintiff filed this civil rights complaint under 42 U.S.C. § 1983 alleging

28  multiple causes of action.  Pursuant to the Court's May 23, 2007 Order, all claims were dismissed

United States District Court
For the Northern District of California

with the exception of four, and the served Defendants move for summary judgment as to all four claims:

(1)     Plaintiff claims that Defendants John Russell and Dennis Bierman used excessive force against him on April 22, 2003.  Defendant Russell was served with the complaint and filed an answer on July 18, 2007.  He also moved for summary judgment on August 10, 2007.  Plaintiff opposed summary judgment on August 30, 2007.  Defendant Bierman could not be located for service of the complaint, thus, he is an unserved Defendant who has not joined Defendant Bierman in his motion for summary judgment.

(2)     Plaintiff claims that Defendants Russell, Vonda Lennon, R.N., Alisha Stottsberry, R.N. and W. Taylor Fithian, M.D. were deliberately indifferent to his medical needs on April 22, 2003.  Defendant Russell answered the complaint and denied this claim on July 18, 2007.  He also moved for summary judgment on August 10, 2007.  Plaintiff filed an opposition on August 30, 2007.  Defendant Lennon answered the complaint and denied this claim on September 26, 2007.  Defendants Stottsberry and Fithian each individually answered the complaint and denied this claim on July 5, 2007.  Defendants Lennon, Stottsberry, and Fithian filed a joint summary judgment motion on October 8, 2007.  Plaintiff filed an opposition to the joint summary judgment motion on October 19, 2007.

(3)     Plaintiff claims that Defendants J. Brown, William Young, and Don Porter denied him due process with regard to his disciplinary hearing on April 27, 2003.  Defendant Porter was served with the complaint.  He filed an answer denying the claim on July 18, 2007 and a summary judgment motion on August 10, 2007.  Plaintiff filed an

2

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

opposition to Defendant Porter's summary judgment motion on August 30, 2007. Defendants Brown and Young could not be located for service of the complaint, thus, they are unserved Defendants who have not joined Defendant Porter in his motion for summary judgment.

(4)   Plaintiff claims that Defendants Rodney Mitchell, Crystal Esberg, Virginia Barajas, James Bauman, and Jason Sestito violated his due process rights when he was incarcerated in "solitary confinement" from October 10, 2003 through March 25, 2004.  All Defendants except Defendant Sestito were served with the complaint.  All served Defendants filed answers denying Plaintiff's claim, including:  Defendant Bauman on July 12, 2007; Defendant Mitchell on July 11, 2007; Defendant Esberg on July 16, 2007; and Defendant Barajas on July 18, 2007.  Defendants Bauman, Mitchell, Esberg and Barajas also filed a joint summary judgment motion on August 10, 2007.  Plaintiff filed an opposition to this joint summary judgment motion on August 30, 2007.

On May 23, 2007, the Court dismissed Plaintiff's claims against Defendants Alice Riedle, Teresa Efestione, and Robin Hauff with leave to amend.  The Court determined that the roles of these Defendants in the original complaint were not clear.  Therefore, the Court directed Plaintiff to file an amendment to the complaint in order to link the aforementioned Defendants to his claims by explaining what each Defendant did that caused a violation of his constitutional rights.

Plaintiff filed an amendment to the complaint on June 20, 2007.  The Court found that Plaintiff's amendment to the complaint stated a cause of action against Defendant Riedle for supervisory liability relating to the alleged excessive force and deliberate indifference claims, as well as a cause of action against Defendants Hauff and Efestione for retaliation after both

3

1  Defendants separately cited Plaintiff for disciplinary violations.

2      Defendant Riedle filed an answer denying Plaintiff's supervisory liability claim on January

3  16, 2008.  She also filed a summary judgment motion on February 15, 2008.  Plaintiff filed an

4  opposition to the summary judgment motion on March 3, 2008.  Defendants Hauff and Efestione

5  were served Plaintiff's amendment to the complaint and each filed an answer denying the retaliation

6  claim on October 26, 2007 and January 16, 2008, respectively.  Both of these Defendants also filed

7  separate motions for summary judgment on November 8, 2007 and February 7, 2008, respectively.

8  Plaintiff filed an opposition to Defendant Hauff's summary judgment motion on November 15, 2007.

9  Plaintiff filed an opposition to Defendant Efestione's summary judgment motion on March 3, 2008.

10                              **DISCUSSION**

11 **I.    Legal Standard for Summary Judgment**

12      The Court will grant summary judgment "against a party who fails to make a showing

13 sufficient to establish the existence of an element essential to that party's case, and on which that

14 party will bear the burden of proof at trial . . . since a complete failure of proof concerning an

15 essential element of the nonmoving party's case necessarily renders all other facts immaterial."

16 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc.,

17 477 U.S. 242, 248 (1986) (A fact is material if it might affect the outcome of the suit under

18 governing law, and a dispute about a material fact is genuine "if the evidence is such that a

19 reasonable jury could return a verdict for the nonmoving party.").  Generally, as is the situation with

20 a defendant who challenges a plaintiff's constitutional claims, the moving party bears the initial

21 burden of identifying those portions of the record that demonstrate the absence of a genuine issue of

22 material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by

23 [his] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,'

United States District Court
For the Northern District of California

designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (citations omitted).

The district court's function on summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. <u>See</u> <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. <u>See</u> <u>id.</u> at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. <u>Id.</u> If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. <u>See</u> <u>id.</u>; <u>see, e.g.</u>, <u>Carmen v. S.F. Unified Sch. Dist.</u>, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence). Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so. <u>Carmen</u>, 237 F.3d at 1029. "The district court need not examine the entire file for evidence establishing a genuine issue of fact." <u>Id.</u> at 1031.

## II.    **Evidence Considered**

A district court may only consider admissible evidence in ruling on a motion for summary judgment. <u>See</u> Fed. R. Civ. P. 56(e); <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 773 (9th Cir. 2002). Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be considered on summary judgment. <u>Orr</u>, 285 F.3d at 773-74, 778.

Here, Plaintiff's oppositions to Defendants' summary judgment motions pertain to allegations

**United States District Court**
For the Northern District of California

stated in his original complaint.  However, none of these oppositions are verified in conformity with

28 U.S.C. § 1746[1] because Plaintiff's verifications state that "I swear this to be a true and correct

statement to the best of my knowledge."  Plaintiff does not assert any of the statements in his

oppositions under "penalty of perjury" as required by 28 U.S.C. § 1746.  The Court therefore cannot

consider these statements in opposition to Defendants' motions for summary judgment.

Where, as here, Plaintiff has not filed verified oppositions to the motions for summary

judgment, the Court may treat the allegations in a verified complaint as an opposing affidavit to the

extent such allegations are based on Plaintiff's personal knowledge and set forth specific facts

admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995)

(treating a plaintiff's verified complaint as opposing affidavit where, even though verification not in

conformity with 28 U.S.C. § 1746, he stated under penalty of perjury that contents were true and

correct, and allegations were not based purely on his belief but on his personal knowledge).

However, Plaintiff has not verified his original complaint and his amendment to the complaint

because they were not signed under "penalty of perjury" as required by 28 U.S.C. § 1746.  Instead,

Plaintiff only signed his original complaint's Proof of Service declaration under penalty of perjury.

---

[1]  28 U.S.C. § 1746 states:

    Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

    . . . .

    (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

United States District Court
For the Northern District of California

Plaintiff's verification of his Proof of Service declaration cannot authenticate the statements in his original complaint, which was only signed as a "true statement to the best of Plaintiff's knowledge."

For the purposes of resolving the motions for summary judgment, the Court will consider as the facts Plaintiff's "unverified" statements; however, it will not treat his original complaint or his amendment to the complaint as opposing affidavits under Rule 56 of the Federal Rules of Civil Procedure.  The Court will also consider as the facts the verified declarations and exhibits submitted by the served Defendants in support of their motions for summary judgment.

## III.   Plaintiff's Claims

### A.   Excessive Force Claim Against Defendants Russell and Bierman

Plaintiff alleges that Defendants Russell and Bierman violated his due process rights with the use of excessive force on April 22, 2003.  As mentioned above, only Defendant Russell was served with the complaint and filed for summary judgment.  The facts of the incident leading to this claim are in controversy.

#### 1.   Factual Background

On February 5, 2003, Plaintiff was arrested by the Lake County Sheriff's Department and charged with violating California Health & Safety Code § 11350(a) (possession of cocaine) and § 11352 (possession of cocaine with intent to sell), California Penal Code § 3056 (violation of California Department of Corrections parole status), and California Vehicle Code § 12500(c) (driving without a license).  On the same day, Plaintiff was booked into the Lake County Jail.  At that time, Plaintiff was provided with a copy of the "Custody Information Booklet" that includes the Uniform Rules of Prisoners' Conduct for inmates as well as other information relating to his incarceration.  (Esberg Decl. ¶ 5, Ex. B.)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### a. Defendant Russell's Version

As of April 22, 2003, Plaintiff was assigned to Cell C-6 at the jail.  Defendant Russell was assigned to work as a Main Pod officer on this date and conducted an inspection of Cell C-6 as part of his duties.  (Russell Decl. ¶ 4.)  During this inspection, Defendant Russell discovered an extra garbage can under the cell's bottom bunk filled with food and books in violation of Minor Rule 312. (Id.)  These items were confiscated by Defendant Russell.  (Id.)  Subsequent to his search, Defendant Russell was serving lunch to inmates with another officer.  (Id.)  It was at this time that Defendant Russell alleges that Plaintiff was disrespectful, confronted, and challenged him.  (Id.)  On the basis of Plaintiff's conduct, Defendant Russell determined it was necessary to stop serving lunch and order a lockdown for the purpose of maintaining order and safety.  (Id.)

Once the lockdown was implemented, inmates returned to their cells and Defendant Russell called for all available officers to respond to Pod C.  (Id.)  Defendant Russell went to Plaintiff's cell and waited for backup.  (Id. ¶ 5.)  At this time, he observed Plaintiff remove his shirt.  (Id.) Defendant Russell ordered Plaintiff to put his shirt back on and to "grab the wall."  (Id.)  Plaintiff ignored the order and refused to respond.  (Id.)  Defendant Russell ordered Plaintiff to "grab the wall" a minimum of four times, but Plaintiff continued to ignore the order.  (Id.)  Eventually, other correctional officers responded to Defendant Russell's call for backup and arrived at Pod C.  (Id.)

After noticing the presence of extra officers for backup, Plaintiff put his shirt back on and put his hands on a shelf located above the towel rack in his cell.  (Id.)  Defendant Russell entered Cell C-6 with Defendant Bierman for the purpose of removing Plaintiff from the cell for booking.  (Id.) Plaintiff resisted.  (Id.)  Regardless, the officers were able to gain control of Plaintiff's arms and place him in handcuffs.  (Id.)  Defendants Russell and Bierman removed Plaintiff from Cell C-6 and escorted him to a dress cell for booking.  (Id. ¶ 6.)

8

**United States District Court**
For the Northern District of California

After escorting Plaintiff to the dress cell, Defendant Russell prepared a narrative report or

"write-up" documenting the incident involving Plaintiff and charging Plaintiff with violating Lake

County Uniform Rules of Prisoners' Conduct.  (Id. ¶ 3, Ex. A.)  Plaintiff was charged with violating

Criminal Rule 106 (Inmates will not fight, challenge, threaten, or make racial slurs towards any

other inmate or staff member), Major Rule 201 (Inmates will obey all lawful orders from jail staff),

Major Rule 202 (Inmates will show respect to jail staff at all times), Major Rule 302 (Inmates will

not engage in conduct that interferes with or disrupts the orderly running of the jail), Minor Rule 312

(Inmates will not possess nor save any food or drink items except those sold through the

commissary), and Miscellaneous Rule 333 (Inmates will be responsible for all clothing and bedding

items returned to them).  (Id.)

### b.   **Plaintiff's Version**

Plaintiff's unverified complaint discloses the following facts.  On April 22, 2003, while

receiving his lunch tray, Plaintiff was antagonized by Defendant Russell.  Defendant Russell

antagonized Plaintiff because Plaintiff was "looking at him [Defendant Russell] in a challenging

manner."  (Compl. at 1.)  Plaintiff asked why Defendant Russell was trying to antagonize him.  At

this point, Defendant Russell became agitated and announced a lockdown.  Once Defendant Russell

requested backup, Plaintiff ended his conversation with Defendant Russell and returned to his cell.

Later, Defendant Russell approached Plaintiff's cell with ten other guards while Plaintiff was eating

his lunch.  While outside Plaintiff's cell door, Defendant Russell requested four times that Plaintiff

"grab the wall" at the back of his cell.  Defendants Russell and Bierman then entered Plaintiff's cell

after Plaintiff got up from his lunch and complied with Defendant Russell's request.  Both officers

pushed Plaintiff against a sink in his cell and twisted his arms behind his back to handcuff him.

Once Plaintiff was handcuffed, Defendant Bierman held his arms while Defendant Russell

9

"slamm[ed] [Plaintiff's] head into the cement wall above [his] sink."  (Id. at 3.)  Plaintiff claims that,

"at no time did I not comply nor did I try to resist any of these officers."  (Id.)

As a result, Plaintiff claims he suffered a lump in the middle of his forehead, migraine

headaches, and rheumatoid arthritis in his left shoulder.

### 2.   <u>Applicable Law</u>

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial

detainee from the use of excessive force that amounts to punishment.  <u>Graham v. Connor</u>, 490 U.S.

386, 395 n.10 (1989) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-39 (1979)); <u>cf.</u> <u>Pierce v. Multnomah

County, Or.</u>, 76 F.3d 1032, 1043 (9th Cir. 1996) (Fourth Amendment reasonableness standard

applies to allegations of use of excessive force against pre-arraignment detainee).  To demonstrate

excessive force violating constitutional rights, Plaintiff must demonstrate that the officers applied

force maliciously to cause Plaintiff harm.  <u>Hudson v. McMillan</u>, 503 U.S. 1, 6-7 (1992).

Although the analysis set forth by the Supreme Court in <u>Hudson</u> arose in the context of an

excessive force claim brought by a prisoner under the Eighth Amendment, several circuits have held

that the <u>Hudson</u> analysis also applies to excessive force claims brought by pretrial detainees under

the Fourteenth Amendment.  <u>See</u> <u>United States v. Walsh</u>, 194 F.3d 37, 48 (2d Cir. 1999); <u>Riley v.

Dorton</u>, 115 F.3d 1159, 1167 (4th Cir. 1997).  However, the Ninth Circuit does not apply the

<u>Hudson</u> analysis and instead applies the Due Process Clause under <u>Graham</u> to protect pretrial

detainees, such as Plaintiff, from the use of excessive force that amounts to punishment.  <u>See</u> <u>Gibson

v. County of Washoe, Nev.</u>, 290 F.3d 1175, 1197 (9th Cir. 2002) ("The Due Process Clause protects

pretrial detainees from the use of excessive force that amounts to punishment . . . . <u>Graham</u>

therefore explicates the standards applicable to a pretrial detention excessive force claim in this

circuit." (citations omitted)).

United States District Court<br/>For the Northern District of California

10

**United States District Court**
For the Northern District of California

The Ninth Circuit has stated that in determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir. 1993); see also Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (holding that guards may use force only in proportion to need in each situation).

California district courts have similarly applied the Graham standard to pretrial detainees' Fourteenth Amendment excessive force claims. See, e.g., Grier v. Smyser, No. C-95-0325 MMC, 1996 WL 723094 (N.D. Cal. Dec. 5, 1996) ("The due process clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment." (citation omitted)); Cornejo v. United States, No. C 94-0957 CAL, 1998 WL 355586 (N.D. Cal. June 29, 1998) ("Pretrial detainees are protected from the use of excessive force by the Due Process Clause . . . the proper inquiry in evaluating whether a condition or restriction violates the Due Process rights of a pretrial detainee is whether the condition amounts to punishment.").

### 3.   Analysis

The Court finds the force used by Defendant Russell on April 22, 2003 was not excessive under the Due Process Clause.  First, the undisputed material facts show that Defendant Russell used mild force only after Plaintiff resisted being handcuffed.  Second, Defendant Russell applied force in order to gain control of Plaintiff and escort him out of his cell.  The amount of force exerted by Defendant Russell was only to gain control of Plaintiff's arms to facilitate handcuffing.

Plaintiff unverified compliant states that Defendant Russell applied excessive force by "slamming [his] head into the cement wall" while Defendant Bierman held Plaintiff's handcuffed

**United States District Court**
For the Northern District of California

wrists.  (Compl. at 3.)  Plaintiff also states that he was not resisting at any point.  (Id.)  Even if the Court considered Plaintiff's unverified complaint, these statements are conclusory.  Plaintiff has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Keenan, 91 F.3d at 1279.  Even if the Court must accept Plaintiff's factual allegations as true for purposes of summary judgment, the Court finds that he has not set forth specific allegations regarding Defendant Russell's conduct or the resulting harm.  The Court is mindful that interested parties cannot concoct genuine issues of material fact simply by submitting conclusory -- and unsupported -- statements in the form of affidavits.  See United States v. Shumway, 199 F.3d 1093, 1104 (9th Cir. 1999) ("If the affidavit stated only conclusions, . . . then it would be too conclusory to be cognizable . . . .").

Here, Plaintiff's conclusory allegations unsupported by factual data are insufficient to defeat Defendant Russell's motion for summary judgment.  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (finding the district court did not err in granting summary judgment because plaintiff failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable).  The Court finds that Plaintiff's claim that Defendant Russell applied excessive force by "slamming [his] head into the cement wall" is unsubstantiated because the record is devoid of any declaration or medical evidence that Plaintiff suffered any injuries, i.e., the alleged lump on his forehead or headaches as a result of Defendant Russell's actions.  Plaintiff claims "Exhibit E" to his unverified opposition contains medical records showing his head injuries. However, upon examining this exhibit, the Court notes that it contains the result of an eye exam Plaintiff received in June, 2007, four years after the alleged incident of excessive force in this case. Accordingly, the Court finds that Plaintiff has not provided sufficient evidence to establish that Defendant Russell slammed Plaintiff's head into a cement wall after being handcuffed.

**United States District Court**
For the Northern District of California

1    Finally, under the circumstances described by Defendant Russell in his verified declaration,

2    it is apparent that the force applied to Plaintiff was used in good faith to maintain or restore

3    discipline and did not amount to punishment.  Plaintiff was visibly disrespectful to Defendant

4    Russell while lunch was being served in Pod C.  As a result, Defendant Russell ordered a lockdown

5    and requested for backup to stabilize the situation.  It is only after Plaintiff further disobeyed

6    Defendant Russell by taking off his shirt and being unresponsive to orders that Defendants Russell

7    and Bierman entered Plaintiff's cell.  Defendant Russell's verified declaration states that Plaintiff

8    resisted, requiring the officers to control Plaintiff's arms in order to place him in handcuffs and

9    remove him from the cell.  Again, even if the Court considers Plaintiff's unverified statement that he

10   was not resisting at any point, the Court finds it to be conclusory and insufficient to defeat

11   Defendant Russell's motion for summary judgment.  See Arpin, 261 F.3d at 922 (plaintiff's statement

12   that she "did not resist arrest in any way" is a conclusory allegation that is insufficient to defeat

13   defendant's motion for summary judgment).

14       Accordingly, the Court finds that the force Defendant Russell used under the totality of the

15   circumstances was objectively reasonable to keep control of Plaintiff, and therefore Plaintiff's

16   excessive force claim fails as a matter of law.  Plaintiff has not established a "genuine issue for trial"

17   concerning the excessiveness of the force Defendant Russell and Bierman used against him on April

18   22, 2003.  Celotex, 477 U.S. at 324.  Accordingly, Defendant Russell is entitled to summary

19   judgment on Plaintiff's claim of excessive force because the record taken as a whole would not lead

20   a rational trier of fact to find for Plaintiff.  See Henderson v. City of Simi Valley, 305 F.3d 1052,

21   1061 (9th Cir. 2002) (summary judgment in favor of defendant proper where evidence in the record

22   in support of plaintiff's excessive force claim was "woefully sparse").  Therefore, Defendant

23   Russell's motion for summary judgment as to Plaintiff's excessive force claim is GRANTED.

**United States District Court**
For the Northern District of California

4.    <u>Defendant Russell's Qualified Immunity Defense</u>

In the alternative, Defendant Russell claims that he is entitled to qualified immunity from Plaintiff's excessive force claim.[2]

a.    <u>Applicable Law</u>

"The defense of qualified immunity . . . protects section 1983 defendants from liability for civil damages when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 650 (9th Cir. 2001).  The qualified immunity analysis is separate from the due process excessive force analysis.  <u>See</u> <u>Marquez v. Gutierrez</u>, 322 F.3d 689, 691 (9th Cir. 2003).  Thus, an officer's actions could violate an inmate's due process rights, however that officer would still be entitled to qualified immunity if a reasonable officer in his position would have believed that his response was a good faith effort to restore discipline.  <u>Id.</u> at 692.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  It "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" <u>Burns v. Reed</u>, 500 U.S. 478, 495 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  "Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." <u>Romero v. Kitsap County</u>, 931 F.2d

---

[2]  The Court notes that all Defendants, except Defendants Lennon, Stottsberry and Fithian, claim a qualified immunity defense.  However, only Defendant Russell provides extensive briefing regarding his qualified immunity defense from Plaintiff's excessive force and deliberate indifference claims, and the remaining Defendants do not do so.  Therefore, the Court will address Defendant Russell's qualified immunity defense after each claim and will address the remaining Defendants' qualified immunity defenses at the end of this Order.

14

624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right, then proceed to determine if the right was "clearly established." Wilson v. Layne, 526 U.S. 603, 609 (1999); Conn v. Gabbert, 526 U.S. 286, 290 (1999).  The threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201 (2001); see Martin v. City of Oceanside, 360 F.3d 1078, 1082 (9th Cir. 2004) (In performing the initial inquiry, the court is obligated to accept the plaintiff's facts as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is stated for a violation of the plaintiff's constitutional rights, but rather whether the defendants actually violated a constitutional right.).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

If a violation could be made out on the allegations, the next sequential step is to ask whether the right was clearly established.  Id.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.  Id. at 202.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id.  If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Id.  The plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct.  See Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).

Contrary to earlier holdings of the Ninth Circuit, the United States Supreme Court has

**United States District Court**
For the Northern District of California

determined that the inquiries for qualified immunity and excessive force are distinct.  Saucier, 533

U.S. at 204.  On the issue of excessive force, the reasonableness of the officer's belief as to the

appropriate level of force should be judged from an "on-scene" perspective.  Id. (citing Graham, 490

U.S. at 396).  Graham does not always give a clear answer as to whether a particular application of

force will be deemed excessive by the courts.  Id.  This is the nature of a test which must

accommodate limitless factual circumstances.  Id.

In the excessive force context, the first step is an inquiry into the objective reasonableness of

the officer's belief in the necessity of his actions; the second step is an inquiry into the objective

reasonableness of the officer's belief in the legality of his actions.  Wilkins v. City of Oakland, 350

F.3d 949, 954-55 (9th Cir. 2003).  Qualified immunity also shields an officer from suit when he

makes a decision that, even if constitutionally deficient, reasonably misapprehends the law

governing the circumstances he confronted.  Brosseau v. Haugen, 543 U.S. 194, 198 (2004);

Saucier, 533 U.S. at 205-06.  If "the officer's mistake as to what the law requires is reasonable . . .

the officer is entitled to the immunity defense."  Saucier, 533 U.S. at 205.

**b.    Analysis**

In applying the first prong of Saucier, the Court must determine whether there was a

constitutional violation.  To do so, the Court only considers Defendant Russell's version of the facts,

because he submitted a verified declaration pursuant to 28 U.S.C. § 1746.  Plaintiff's unverified

statements, i.e., that Defendant Russell "slamm[ed] [his] head into the cement wall" or that he was

not resisting at any point, are not considered because, as mentioned above, he did not sign his

original complaint, his amendment to the complaint, or his oppositions under "penalty of perjury."

See Schroeder, 55 F.3d at 460 & nn.10-11.  Viewing Defendant Russell's version of the facts in a

light most favorable to Plaintiff, Defendant Russell's actions did not amount to a due process

1   violation.

2       Turning to the second prong of <u>Saucier</u>, even were the Court to assume a constitutional

3   violation had occurred on this evidence, it would not have been clear to a reasonable officer in

4   Defendant Russell's position that his conduct violated the prohibition against excessive force.  It is

5   not disputed that, at the time of Defendant Russell's actions, the use of excessive force that amounts

6   to punishment was a violation of Due Process Clause under <u>Graham</u>.  <u>See Gibson</u>, 290 F.3d at 1197.

7   At issue is whether Defendant Russell's actions were objectively reasonable "in light of the facts and

8   circumstances confronting them, without regard to their underlying intent or motivation." <u>Graham</u>,

9   490 U.S. at 397 (citation and internal quotation marks omitted).

10      Defendant Russell admits to gaining control of Plaintiff's arms and placing him in handcuffs

11  while Plaintiff resisted.  The Court finds that a reasonable officer in Defendant Russell's position

12  could have believed that his acts comported with the Due Process Clause in light of clearly

13  established law and the information Defendant Russell possessed at the time of the incident.  <u>See</u>

14  <u>Saucier</u>, 533 U.S. at 205 (citing <u>Graham</u>, 490 U.S. at 396) (reasonableness of officer's belief as to

15  appropriate level of force should be judged from an on-scene perspective).

16      Therefore, under <u>Saucier</u>, Defendant Russell is entitled to qualified immunity with respect to

17  Plaintiff's claim of excessive force and thus he is entitled to summary judgment as a matter of law.

### B.      **Deliberate Indifference to Serious Medical Needs Claims**

Plaintiff alleges that Defendants Russell, Lennon, Stottsberry and Fithian were deliberately

indifferent to his serious medical needs while incarcerated in Lake County Jail.

### 1.      **Applicable Law**

"Deliberate indifference" is the appropriate standard for evaluating pretrial detainees'

medical claims.  <u>See Redman v. County of San Diego</u>, 942 F.2d 1435, 1443 (9th Cir. 1991).  A

17

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

determination of "deliberate indifference" involves an examination of two elements: the seriousness of the inmate's medical need and the nature of the Defendant's response to that need.  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Tech., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A "serious" medical need exists if the failure to treat an inmate's condition could result in further significant injury or the "wanton infliction of unnecessary pain."  Id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that an inmate has a "serious" need for medical treatment.  Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care.  See id. at 1062.  It may encompass cases where a defendant should have known that the plaintiff had serious medical needs even if the defendant was not subjectively aware of those needs.  See Redman, 942 F.2d at 1443 (discussing "reckless indifference" standard and questioning whether Eighth Amendment state-of-mind standards should apply to pretrial detainees' claims).

A claim of mere negligence, however, is never sufficient to establish a violation of any

18

constitutional rights.  See County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (holding that

liability for negligently inflicted harm is categorically beneath the threshold of constitutional due

process).  An official's "failure to alleviate a significant risk that an official should have perceived

but did not, while no cause for commendation, cannot be condemned as the infliction of

punishment."  Farmer, 511 U.S. at 838.  Instead, the "official's conduct must have been 'wanton,'

which turns not upon its effect on the [inmate], but rather, upon the constraints facing the official."

Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing Wilson v. Seiter, 501 U.S. 294, 302-03

(1991)).  Prison officials violate their constitutional obligation only by "intentionally denying or

delaying access to medical care."  Estelle, 429 U.S. at 104-05.  "A difference of opinion between a

prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

claim."  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Similarly, a showing of nothing

more than a difference of medical opinion as to the need to pursue one course of treatment over

another is insufficient, as a  matter of law, to establish deliberate indifference.  See Toguchi v.

Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004).  In order to prevail on a claim involving choices

between alternative courses of treatment, Plaintiff must show that the course of treatment the doctors

chose was medically unacceptable under the circumstances and that they chose this course in

conscious disregard of an excessive risk to Plaintiff's health.

### 2. Defendant Russell

#### a. Factual Background

##### (1) Defendant Russell's Version

After the April 22, 2003 incident, Plaintiff did not complain to Defendant Russell of pain or

injury or request medical treatment after being removed from his cell.  Defendant Russell did not

observe any bruises or marks on Plaintiff indicating injury or that he was in pain.  (Russell Decl.

¶ 7.)  Therefore, Defendant Russell claims he had no knowledge of any physical condition from which Plaintiff suffered that may require medical attention or treatment.  (<u>Id.</u> ¶ 8.)

<div align="center">(2)      <u><b>Plaintiff's Version</b></u></div>

Plaintiff's unverified original complaint alleges he suffered certain injuries as a result of the April 22, 2003 incident.  Among these claimed injuries was a lump in the middle of his forehead, pain in his left shoulder, and headaches.  (Compl. at 3-4.)  Once placed in the holding cell for booking after the incident, Plaintiff requested that Defendant Russell call the jail medical staff to address a headache he was suffering as a result of the lump on his head.  Defendant Russell responded that he was still "pissed" at Plaintiff and would not provide Plaintiff with medical treatment for his injuries.  (Compl. at 5.)  Plaintiff also alleges Defendant Russell ignored several sick call slips he filed for medical treatment.

<div align="center">b.      <u><b>Analysis of Deliberate Indifference Claim Against Defendant Russell</b></u></div>

First, the Court finds that Plaintiff fails to establish that he had a serious medical need following the April 22, 2003 incident.  As mentioned above, Plaintiff fails to provide any proof that he suffered a lump on his head after the incident.  Also, there is no evidence that Plaintiff's headaches and shoulder pain were caused by the incident.  Coincidentally, the record shows that Plaintiff's migraine headaches and shoulder pain actually pre-existed the incident.  For instance, Plaintiff was prescribed Motrin for occasional migraines prior to April 22, 2003.  Motrin was among the medications found stashed in Plaintiff's cell during a search conducted immediately after he was escorted to booking by Defendant Russell.  (Lennon Decl. ¶ 7; Stottsberry Decl. ¶ 5.)  Plaintiff's shoulder injury also pre-existed April 22, 2003.  By his own account, Plaintiff's left shoulder pain

<div style="writing-mode: vertical-lr"><b>United States District Court</b><br>For the Northern District of California</div>

was the result of aggravated rheumatoid arthritis from a January, 2000 surgery.[3]  (Compl. at 4.)

Therefore, the Court finds that Plaintiff has not demonstrated that the failure to obtain care at the

time he requested relief from Defendant Russell had caused or contributed in any way to Plaintiff's

on-going medical issues.

Secondly, in his verified declaration, Defendant Russell claims that he did not know Plaintiff

needed medical care or suffered bodily harm after escorting him to booking; therefore, he claims it

was impossible for him to retain the culpable intent to keep Plaintiff from receiving care.  (Russell

Decl. ¶¶ 7, 8.)  Thus the Court finds that Plaintiff has failed to show that Defendant Russell acted

with deliberate indifference.

Accordingly, because Plaintiff has failed to raise a triable issue of material fact that he

suffered a serious medical need after the April 22, 2003 incident or that Defendant Russell acted

with deliberate indifference, Defendant Russell's motion for summary judgment as to Plaintiff's

deliberate indifference claim is GRANTED.

**c.    <u>Defendant Russell's Qualified Immunity Defense</u>**

Again, in the alternative, Defendant Russell contends that he is entitled to qualified immunity

on this claim.  The standard for consideration of qualified immunity is set out above.

Defendant Russell does not dispute that the law regarding deliberate indifference to an

inmate's serious medical needs was clearly established at the time of his actions.  See <u>Clement v.</u>

<u>Gomez</u>, 298 F.3d 898, 906 (9th Cir. 2002).  Rather, he maintains that a reasonable officer could have

believed that his conduct was lawful in light of what he knew and the action he took.  Whether a

---

[3]  Also, Plaintiff confuses which shoulder was allegedly injured in the April 22, 2003 incident. His unverified original complaint alleges the arthritis in his left shoulder was aggravated in the incident. (Compl. at 3-4.)  However, Plaintiff contradicts himself in another document filed on June 4, 2007, entitled "Notice of Amended Complaint, Notice of Response to Order, Notice of Continued Intent to Prosecute," wherein he alleges he suffered "constant acute arthritis pain to his <u>right</u> shoulder" from the incident. (June 4, 2007 Notice of Am. Compl. at 8 (emphasis added).)

**United States District Court**
For the Northern District of California

prison official acted reasonably is a mixed question of law and fact:

> It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took. If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine.

Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995).

Plaintiff has failed to establish that he suffered any injury which required medical attention following the April 22, 2003 incident. Also, Plaintiff has not demonstrated that the failure to obtain care at the time he requested relief from Defendant Russell had caused or contributed in any way to Plaintiff's ongoing medical issues. Finally, Plaintiff has not shown that Defendant Russell harbored a culpable mind to cause Plaintiff pain and suffering by denying him medical treatment.

Accordingly, Defendant Russell is entitled to qualified immunity from Plaintiff's deliberate indifference claim because Plaintiff has failed to raise a triable issue of material fact relating to the historical facts of what Defendant Russell knew or what he did following the April 22, 2003 incident.

### 3.   Defendants Lennon, Stottsberry and Fithian

Plaintiff also alleges that, due to the events on April 22, 2003, he was denied mental health care and medication. (Compl. at 5-6.) Plaintiff specifically claims that "due to a couple of pills being found during a cell search of [his] cell #6 on April 22, 2003," the medication was discontinued for "2 to 3 months by Vonda [Lennon], [his] case worker at the jail, Medical Director Alisha Stottsberry, and psychiatrist Dr. Fithian of the California Forensic Medical Group." (Id. at 6.)

#### a.   Factual Background

##### (1)   Defendants Lennon's, Stottsberry's and Fithian's Version

A licensed vocational nurse reported on April 20, 2003 that Plaintiff had tried to hide

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

medications in a cup rather than ingesting the medication at the time of delivery. (Stottsberry Decl. ¶ 10; Lennon Decl. ¶ 5.) On April 21, 2003, Plaintiff was warned against continuing to hide his medication by Defendant Lennon, the psychiatric nurse. Plaintiff was counseled concerning the medication rules and the need to take his medication as prescribed. (Stottsberry Decl. ¶ 11; Lennon Decl. ¶ 6.) This interaction between Plaintiff and Defendant Lennon was followed-up on the next day by a report from custody personnel that medication had been found "stashed" in Plaintiff's cell. (Stottsberry Decl. ¶ 12; Lennon Decl. ¶ 7.)

Defendant Lennon reported these occurrences to the "on call" psychiatrist, Defendant Fithian. (Stottsberry Decl. ¶ 13; Lennon Decl. ¶¶ 8-9; Fithian Decl. ¶¶ 2-4.) Defendant Fithian was advised concerning the level of medication that had been prescribed and the clinical presentation of Plaintiff that led up to the prescription of Hadol and Motrin, the medications that had been "stashed." (Stottsberry Decl. ¶ 13; Lennon Decl. ¶¶ 8-9; Fithian Decl. ¶¶ 2-6.) Defendant Fithian assessed the information presented to him for his decision making process, the nature of the reported complaints that had resulted in initial prescription, the potential risk to Plaintiff were he to ingest higher dosages of the medication by swallowing multiple hoarded pills, and/or the risk to other inmates with whom the hoarded pills might be bartered in exchange for other goods. (Stottsberry Decl. ¶¶ 13, 22; Lennon Decl. ¶ 9; Fithian Decl. ¶¶ 3-6.) Defendant Fithian then made the medical decision to discontinue medication upon finding that the risks associated with Plaintiff's behavior outweighed any hypothetical risks to Plaintiff that would result from discontinuing the medications that Plaintiff stashed. (Stottsberry Decl. ¶¶ 13, 22; Lennon Decl. ¶ 9; Fithian Decl. ¶¶ 3-6.)

Subsequent to the order to discontinue medication, Plaintiff was monitored by medical and psychiatric personnel. (Stottsberry Decl. ¶¶ 14-21; Lennon Decl. ¶¶ 10-14, 16-17; Fithian Decl. ¶ 7.) A further review of Plaintiff's chart and conduct in hoarding pills was undertaken by another

psychiatrist on April 24, 2003, and the order to discontinue Plaintiff's medications was continued. (Stottsberry Decl. ¶¶ 14-15; Lennon Decl. ¶ 10.)  After being taken off medication in April, Plaintiff did not submit a sick call slip until June 4, 2003.  After submitting this slip, he was seen by Defendant Lennon.  (Lennon Decl. ¶ 16.)  On this occasion, Plaintiff did not report any specific psychiatric problems or complaints and he was advised that, absent such complaints and based on his presentation at the time, that no referral to the psychiatrist was warranted.  (Id.)

Plaintiff was seen by the jail's psychiatric staff on multiple occasions in June, 2003 for refills of Motrin.  However, Plaintiff did not report any psychiatric problems to the staff during these medical visits.  (Stottsberry Decl. ¶ 17.)  On July 15, 2003, Plaintiff was seen by Defendant Lennon after reporting that he was "hearing loud voices."  (Lennon Decl. ¶¶ 13-14.)  At this time, Plaintiff apologized for the prior incident with the stashed pills and was scheduled for a psychiatric exam. (Id.)  Dr. J. Allen Miller, a psychiatrist, examined Plaintiff at the scheduled psychiatric exam.  (Id. ¶ 14.)  Dr. Miller placed Plaintiff on Lithium and prescribed the medication for the duration of Plaintiff's incarceration.  (Stottsberry Decl. ¶ 21; Lennon Decl. ¶ 14.)

### (2)    Plaintiff's Version

According to his unverified complaint, on the night of April 22, 2003, Plaintiff began sending the first of many sick call slips to be seen by Defendant Lennon.  However, Defendant Lennon refused to provide Plaintiff mental health treatment or discuss Plaintiff's mental state.

Due to the April 22, 2003 events, the medical personnel at the jail discontinued Plaintiff's anti-psychotic medication and any further treatment.  After filing an inmate grievance, Plaintiff received a response from Defendant Stottsberry, stating that Plaintiff was not receiving mental health attention and treatment after it was found that Plaintiff was stashing his medication.  As a result, Plaintiff suffered two to three months without mental health attention or medication.

United States District Court
For the Northern District of California

1   Similarly, none of Plaintiff's sick call requests and grievances were acknowledged or responded to.

2

3

4   **b.      Analysis of Deliberate Indifference Claim Against Defendants
         Lennon, Stottsberry and Fithian**

5       To overcome summary judgment on this claim, Plaintiff must identify with reasonable

6   particularity, evidence that he suffered from a substantial risk of serious harm and that jail officials

7   knew of the harm and disregarded the risk by failing to take reasonable steps to abate it.  See

8   Farmer, 511 U.S. at 837.  As shown above, Plaintiff has not established facts which show he

9   suffered serious harm following the April 22, 2003 incident.  Similarly, Plaintiff cannot establish

10  that jail officials knew that he was suffering from any harm from being taken off medication. The

11  record shows that after Plaintiff was taken off Haldol by Defendant Fithian for "stashing" the

12  medication in his cell, Plaintiff did not submit a sick call slip until June 4, 2003.  (Stottsberry Decl. ¶

13

14  16; Lennon Decl. ¶ 11.)  Plaintiff claims he filed numerous unanswered sick call requests after his

15  medication was revoked on April 22, 2003, but provides no evidence of such requests.[4]  In June

16  2003, Plaintiff was seen on multiple occasions by the jail's medical staff, but no psychiatric

17  complaints were reported.  (Stottsberry Decl. ¶ 17.)  It was only on July 14, 2003, that Plaintiff

18

19  complained of "hearing voices" from being off medication.  (Id. at ¶ 18.)  After this complaint,

20  Plaintiff was scheduled for a full psychiatric exam and prescribed Lithium for the remainder of his

21  incarceration.

22

23      Even if the Court assumes that "hearing voices" is a serious medical condition, Plaintiff fails

24  to establish deliberate indifference because the record does not show that Defendants Lennon,

25  Stottsberry and Fithian intended to deny Plaintiff medication to cause him harm.  Defendants

26

27  ──────────────

28      [4]  The only health care request form Plaintiff provides is for treatment for a "cold" from January
    2, 2007.  (June 4, 2007 Notice of Am. Compl., Ex. F.)

United States District Court
For the Northern District of California

1  Lennon and Stottsberry discontinued Plaintiff's medication at Defendant Fithian's behest.  Therefore,

2  it is undisputed that Defendants Lennon and Stottsberry were not responsible for discontinuing

3  Plaintiff's medication.  Hence, there is no factual basis to support Plaintiff's deliberate indifference

4  claim against Defendants Lennon and Stottsberry.

5

6       Indeed, Defendant Fithian made the decision to discontinue Plaintiff's medication after

7  learning Plaintiff was stashing pills in his cell.  Defendant Fithian's decision was a reasoned medical

8  decision based on balancing Plaintiff's symptoms with the potential risks of accumulated

9  unauthorized amounts of medicine in Plaintiff's possession.  Defendant Fithian's decision was also

10  based on his continual assessment of Plaintiff's psychiatric condition throughout June, 2003.  Thus,

11  instead of evincing an intent to purposefully harm Plaintiff, Defendant Fithian's subjective medical

12  decision was undertaken for Plaintiff's protection.  Even if Plaintiff should have received different

13  treatment for his medical needs, a difference of opinion as to the urgency and treatment of his

14  medical needs is insufficient, as a matter of law, to establish deliberate indifference.  See Toguchi,

15  391 F.3d at 1058, 1059-60.  Although the medical treatment Plaintiff received from Defendant

16  Fithian may not have been what he considered proper treatment, he presents no evidence that

17

18  Defendant Fithian were deliberately indifferent to his serious medical needs.

19

20       Therefore, Plaintiff has failed to raise a triable issue of material fact that he suffered from a

21  serious medical need and that Defendants Lennon, Stottsberry and Fithian acted with deliberate

22  indifference when discontinuing Plaintiff's medication.  Accordingly, Defendants Lennon's,

23  Stottsberry's and Fithian's motion for summary judgment as to Plaintiff's deliberate indifference

24  claim is GRANTED.

25

26       **C.**   **Due Process Claim Regarding Plaintiff's April 27, 2003 Disciplinary Hearing
        Against Defendants Brown, Young and Porter**

27

28

26

**United States District Court**
For the Northern District of California

Plaintiff alleges that he was denied his right to a fair and impartial disciplinary hearing on April 27, 2003, relating to the write-up by Defendant Russell stemming from the April 22, 2003 incident.  Plaintiff's unverified original complaint alleges that his due process rights were violated at this hearing when Defendants Brown, Young and Porter denied him opportunity to present witnesses and be present during the hearing.  As mentioned above, only Defendant Porter was served with the complaint and filed for summary judgment.

### 1.   Factual Background

Plaintiff was notified of a write-up stemming from charges relating to the April 22, 2003 incident involving Defendant Russell and was given an "Inmate Rights at Hearing" form.  (Esberg Decl. ¶ 6a.)  Plaintiff acknowledged the receipt of the form with his signature.  (Id., Ex. C2.)

### a.   Defendant Porter's Version

On April 25, 2003, Plaintiff sent a request form to Defendant Sestito requesting that he meet with Plaintiff prior to the scheduled hearing on April 27, 2003 because Plaintiff "forgot to provide a list of 'witnesses' to be present during the hearing."  (Esberg Decl. ¶ 8, Ex. F.)  Defendant Sestito complied with the request and met with Plaintiff on April 26, 2003.  (Id.)

On April 27, 2003, the Inmate Disciplinary Hearing Board (Board), comprised of two officers and one civilian jail personnel, convened to hear all pending charges against Plaintiff.  The Board included Defendants Porter, Young and Brown.  Plaintiff was present at the hearing.  (Porter Decl. ¶ 5.)

Plaintiff received all the legal rights to which he was entitled, including receipt of a written copy of the charges against him at least twenty-four hours prior to appearing before the Board, a hearing within seventy-two hours of written notice, notification of his right of representation by a fellow inmate or staff member, notification of his right to call witnesses and present evidence in his

27

defense, the opportunity to present witnesses and evidence at the time of the hearing, a written statement of the evidence relied on by the Board, and the reason for taking disciplinary action. (Esberg Decl. ¶ 7.)

In the course of the hearing, Defendant Porter personally spoke with Plaintiff regarding his witnesses.  (Porter Decl. ¶ 5, Ex. A.)  Plaintiff stated to Defendant Porter that he no longer wished to have his witnesses interviewed.  (Id.)  Defendant Porter documented this conversation on the Board's report.  (Id.)  Defendant Porter made these notations during his conversation with Plaintiff.  (Id.)

Following the hearing, Plaintiff submitted two appeal forms alleging that all charges should be "dropped . . . due to not having my witnesses called at my hearing violating my due process rights." (Esberg Decl. ¶ 9, Ex. G.)   The appeals were denied with a note stating, "Your witnesses were not called because you told officer Porter you no longer wished to have them interviewed." (Id.)

The Board found Plaintiff guilty of all the charges stemming from the April 22, 2003 incident.  Plaintiff was placed in disciplinary lockdown for twenty days from May 22, 2003 to June 6, 2003.  (Esberg Decl., Ex. C4.)  During this time, Plaintiff was not allowed to purchase nor possess any commissary with the exception of writing and hygiene materials.  (Id.)  Plaintiff's phone privileges were also limited to legal purposes only.  (Id.)

### b.     Plaintiff's Version

According to Plaintiff's unverified complaint, he received an Inmate Rights at Hearing Form prior to the April 27, 2003 disciplinary hearing.  At the bottom of this form, Plaintiff listed five inmates who he requested be called as witnesses on his behalf.  Plaintiff personally made the request that these witnesses appear to Defendant Sestito.  Plaintiff's disciplinary hearing on April 27, 2003 was before a three-person panel composed of Defendants Brown, Porter and Young.  At the hearing,

the Board addressed both Plaintiff's incident with Defendant Russell as well as the search and confiscation of hidden medication in Plaintiff's cell.  During the hearing, Defendant Brown did not sit with the other two members of the Board, but stood over Plaintiff and yelled at him in a very disrespectful manner to urge him "to learn how to follow the rules." (Compl. at 8.)  The Board refused to call Plaintiff's witnesses.  When Plaintiff complained about his witnesses not being called, Defendant Brown asked Plaintiff to leave the hearing.  Later that same day, Defendant Porter told Plaintiff that the Board did not have time to call Plaintiff's witnesses and decided it was not necessary to hear from them.

### 2. <u>Applicable Law</u>

Under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt on criminal charges in accordance with due process of law.  <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979).  The Ninth Circuit has held that the imposition of disciplinary segregation or some other sanction against pretrial detainees as punishment for violation of jail rules and regulations is "punishment" that cannot be imposed without due process, i.e., without the procedural requirements of <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974).  <u>See</u> <u>Mitchell v. Dupnik</u>, 75 F.3d 517, 523-26 (9th Cir. 1996) (holding that <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) does not apply to pretrial detainees who are punished; applying due process requirements of <u>Wolff</u>).

<u>Wolff</u> established five procedural requirements.  First, "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." <u>Wolff</u>, 418 U.S. at 564.  Second, "at least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the [disciplinary committee]." <u>Id.</u>  Third, "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." <u>Id.</u> (quoting

Morrissey v. Brewer, 408 U.S. 471, 489 (1972)).  Fourth, "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  Wolff, 418 U.S. at 566; see also Bartholomew v. Watson, 665 F.2d 915, 917-18 (9th Cir. 1982) (right to call witnesses is basic to fair hearing and decisions to preclude should be on case-by-case analysis of potential hazards of calling particular person).  Fifth,

> [w]here an illiterate inmate is involved . . . or whether the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or . . . to have adequate substitute aid . . . from the staff or from a[n] . . . inmate designated by the staff.

Wolff, 418 U.S. at 570.

### 3.   **Analysis**

To defeat Defendant Porter's motion, Plaintiff must show sufficient facts to establish that Defendant Porter denied him certain minimum procedural protections in establishing guilt.  The Court finds that Plaintiff has failed to do so.

Defendant Porter's verified declaration provides that the Lake County Sheriff's Department adopts a inmate disciplinary hearing policy which provided inmates with due process protections in accordance with the requirements of Wolff.  In applying the Wolff test to Plaintiff's disciplinary hearing, it is clear there was no due process violation.  First, Plaintiff's unverified complaint admits that on April 25, 2003, he was provided written notice in an "Inmate Rights at Hearing Form" relating to disciplinary action for each offense.  (Compl. at 7.)  Delivery of these forms was confirmed by Plaintiff's signature.  (Esberg Decl., Ex. C2.)  This notice satisfied the time requirement to allow Plaintiff to prepare for his hearing on April 27, 2003.  Also, the Board prepared a report of the hearing proceedings and its factual determination.  (Porter Decl. ¶ 4.)  This report was

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    signed by all three members of the Board and directed to the Chief Disciplinary Officer.  (<u>Id.</u>)

2        The record shows that at Plaintiff's disciplinary hearing he admitted to the confrontation with

3    Defendant Russell and attributed his actions to exhaustion and medication.  (Porter Decl., Ex. A.)

4    Plaintiff also admitted to stashing prescribed medication in his cell.  (<u>Id.</u>)  The Board's report also

5    shows that Defendant Porter spoke with Plaintiff about interviewing his identified witnesses during

6    the hearing but that Plaintiff no longer requested his witnesses be interviewed.  (<u>Id.</u>; Esberg Decl.,

7    Ex. G.)  Therefore, Plaintiff's previously identified witnesses were not interviewed by the Board,

8    without infringing on Plaintiff's right to call witnesses.

9        Plaintiff provides no support for his unverified allegations that the Board was precluded from

10   interviewing his witnesses because of time constraints or that he asked to leave his disciplinary

11   hearing.  Moreover, Plaintiff does not offer any evidence demonstrating that the witnesses he sought

12   to call had relevant information to present at the hearing.  Prison officials retain the discretion to

13   deny the calling of witnesses who are irrelevant.  <u>See</u> <u>Wolff</u>, 418 U.S. at 566.  Furthermore,

14   Plaintiff's claim that the Board was biased is conclusory and not factually supported.  <u>See</u> <u>Leer v.</u>

15   <u>Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988) (conclusory allegations not sufficient to defeat motion

16   for summary judgment).  Accordingly, the Court finds it undisputed that Plaintiff's disciplinary

17   hearing afforded sufficient procedural protections to protect his due process rights.  Thus, Defendant

18   Porter's motion for summary judgment as to Plaintiff's due process claim is GRANTED.

19       **D.    Due Process Claim Regarding Plaintiff's Housing from October 10, 2003
            through March 25, 2004 Against Defendants Mitchell, Esberg, Barajas, Bauman
            and Sestito**

20       In his unverified complaint, Plaintiff contends that Defendants Mitchell, Esberg, Barajas,

21   Bauman and Sestito violated his due process rights when he was housed in "solitary confinement"

22   from October 10, 2003 through March 25, 2004.  (Compl. at 27.)  He claims he was "held in B-Pod

**United States District Court**
For the Northern District of California

isolation for no reason, other than the jail discriminating on [him] for the previous narrative reports (write-ups) on the alleged 'in house' charge of exposure." (Compl. at 15.)  As mentioned above, all Defendants except Defendant Sestito were served with the complaint and filed for summary judgment.

        **1.**        <u>**Factual Background**</u>

        **a.**        <u>**Defendants Mitchell's, Esberg's, Barajas's and Bauman's Version**</u>

      The classification of inmates at the Lake County Jail is pursuant to policies and procedure implemented by the Lake County Sheriff's Department Custody Division.  (Barajas Decl. ¶ 3.)  It is the policy of the Lake County Jail to classify inmates in a fair and consistent manner utilizing written classification procedures.  (<u>Id.</u>)  The classification system is designed to reduce violence and victimization, minimize new crimes within the facility, and provide a secure custodial environment. (<u>Id.</u>)

      The classification process begins the moment an inmate is brought into the Lake County Jail and continues through to formal classification.  Classification is done in accordance with established guidelines, objectively identifying and categorizing various inmate characteristics and potential risks in order to house inmates in a safe and humane manner.  The objective of proper classification is to ensure secure jail operations and staff safety.  (Barajas Decl. ¶ 4, Ex. A.)  Inmates deemed to pose a real and present risk to the security of the jail, staff, visitors, or other inmates are classified as maximum security, requiring close supervision and a high security housing assignment.  (<u>Id.</u>) Decisions concerning an inmate's level of classification are subject to frequent review by the Facility Commander, according to the Policy and Procedures Memoranda, Policy 1.11.1 - Classification Plan. (<u>Id.</u>)  Inmates have a right to appeal a classification assignment according to the Policy and Procedures Memoranda, Policy 1.11.2 - Classification Procedures.  (<u>Id.</u>)

United States District Court
For the Northern District of California

Pursuant to classification policies and procedures, Plaintiff was classified as a "Level 4" inmate for housing in maximum security throughout the course of his stay at the Lake County Jail. (Barajas Decl. ¶ 7a, Ex. B.)  On occasion, Plaintiff was re-housed within the general jail population, notwithstanding his maximum security housing classification.  Plaintiff's re-housing to a lower security housing assignment was made pursuant to "classification override," on the recommendation of the Jail's Classification Committee and approval by the Jail Commander.  (Barajas Decl. ¶ 6.)

On October 7, 2003, Plaintiff, who was assigned to Pod F (a maximum security housing unit), was re-housed to Pod C (a general population housing unit) based on room availability. (Barajas Decl. ¶ 7b, Ex. C.)

On October 10, 2003, Plaintiff was re-housed to Pod B (another maximum security housing unit) following an incident in which he exposed his genitalia to jail personnel and was masturbating. This incident was reported by Officer Flynn, who prepared the write-up.  Officer Flynn reported that Plaintiff had previously exhibited this type of behavior.  Officer Flynn charged Plaintiff with a violation of California Penal Code § 314.1 (public exposure) and Major Rule 201 (Inmates will obey all lawful orders from the jail staff), Major Rule 202 (Inmates will show respect to jail staff at all times), Major Rule 221 (Inmates will not expose themselves to other inmates, civilians or staff), Major Rule 227 (Inmates will not engage in sexual acts or make sexual threats or proposal to other inmates or jail staff), Minor Rule 302 (Inmates will not engage in conduct that interferes with or disrupts the orderly running of the jail), Minor Rule 303 (Inmates will not act in ways that are loud, boisterous or disruptive), and Minor Rule 310 (Inmates will not use any item for anything other than its intended use).  (Barajas Decl. ¶ 7d, Ex. E.)

Also on October 10, 2003, Plaintiff requested clarification concerning his housing assignment.  Defendant Barajas, as Chief Classification Officer, personally spoke with Plaintiff and

United States District Court
For the Northern District of California

1    explained that his housing assignment was based on his classification for maximum security

2    housing.  (Barajas Decl. ¶ 7c, Ex. D.)

3        On November 3, 2003, Plaintiff was presented with a form entitled "Inmate Rights at

4    Hearing" by Defendant Sestito relating to the write-up by Officer Flynn.  Defendant Sestito noted

5    that Plaintiff refused to sign the form acknowledging its receipt and stated that he did not want a

6    hearing.  (Barajas Decl. ¶ 7d, Ex. E.)

7        The disciplinary charges against Plaintiff were heard by the Board on November 11, 2003.

8    The Board found Plaintiff guilty of all charges.  However, the Board determined that the hearing was

9    not conducted within seventy-two hours of Plaintiff's notification of the charges against him.

10   Because of this, no disciplinary action was imposed on Plaintiff.  (Barajas Decl. ¶ 7d, Ex. E.)

11       On March 25, 2004, a classification override request was approved by the Classification

12   Committee and Jail Commander allowing Plaintiff to be re-housed in general population, despite

13   Plaintiff's maximum security classification.  (Barajas Decl. ¶ 7e, Ex. F.)

14       At all times while at the Lake County Jail, Plaintiff was housed in accordance with his

15   maximum security classification or, alternatively, in lower security housing due to a classification

16   override.  ((Barajas Decl. ¶ 9.)

17              **b.    <u>Plaintiff's Version</u>**

18       According to his unverified complaint, Plaintiff was removed from Pod C and rehoused in

19   "solitary confinement" on October 10, 2003, as a result of Defendant Sestito's write-up regarding

20   Plaintiff's alleged indecent exposure.  Plaintiff claims he was held in isolation for no reason other

21   than discrimination for previous write-ups on alleged indecent exposure.  On March 25, 2004,

22   Defendant Barajas interviewed Plaintiff about his housing situation.  During the interview, Plaintiff

23   explained that his constitutional rights were violated because the jail was holding him in solitary

United States District Court
For the Northern District of California

1  confinement for no good reason since he was not guilty of the allegations in the write-ups.  After the

2  interview, Defendant Barajas spoke with Defendant Esberg and Plaintiff was moved out of isolation

3  and into Pod C.  Prior to being moved out of isolation, Plaintiff wrote grievance letters to

4  Defendants Mitchell, Esberg and Bauman notifying them that he was being "illegally" held in

5  solitary confinement.  None of the staff supervisors answered any of these grievance letters.

### 2.      Applicable Law

It is settled in our circuit that a pretrial detainee may not be placed in segregation or more

restrictive housing as <u>punishment</u> for violation of jail rules and regulations without the procedural

requirements of Wolff, which include notice and an opportunity to be heard.  See Mitchell v.

Dupnik, 75 F.3d 517, 523-26 (9th Cir. 1996).  But it still is not settled whether any such process is

required before a pretrial detainee is reclassified and placed in more restrictive housing for non-

punitive reasons.  Cf. Sandin, 515 U.S. at 484 (convicted prisoner has right to procedural protections

only if deprivation at issue is one of "real substance" so as to impose "atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life").  In general, there is no

constitutional right to any particular classification.  See Hernandez v. Johnston, 833 F.2d 1316, 1318

(9th Cir. 1987) (citing Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976)).  Thus, changes in conditions

relating to classification and reclassification do not implicate the Due Process Clause itself.  See id.

### 3.      Analysis of Due Process Claim Regarding Plaintiff's Housing Against Defendants Esberg, Barajas and Sestito

Plaintiff claims he was housed in "solitary confinement" from October 10, 2003 through

March 25, 2004 as a disciplinary measure for infractions he ultimately was not disciplined for;

however, the undisputed facts show that he was actually classified to be housed in Pod B, a

maximum security housing unit at the Lake County Jail.  (Barajas Decl. ¶ 8.)  The record shows that

the Lake County Sheriff's Department originally classified Plaintiff for maximum security housing

35

throughout his stay at the Lake County Jail due to his history of misbehavior towards jail staff and his fellow inmates, that Plaintiff had the opportunity to contest his classification and placement, and that his classification and placement were reviewed periodically.  The Court finds that Plaintiff's original classification is not constitutionally suspect, and the undisputed facts show that he was never re-classified to general population.  See Moody, 429 U.S. at 88 n.9.  While Plaintiff was classified to stay in maximum security for the full extent of his jail term, the record shows that he was allowed the privilege of being housed in general population in Pod C pursuant to a classification override.  Therefore, the Court finds that, on October 10, 2003, Plaintiff was placed in Pod B for legitimate non-punitive reasons.  Even if Plaintiff argues that his re-housing to Pod B was punitive because it came after the write-up for indecent exposure for which no disciplinary action was imposed, his argument is unavailing because Plaintiff was always classified for maximum security housing.

Accordingly, the Court finds that Plaintiff's re-housing to maximum security from October 10, 2003 through March 25, 2004 did not violate his constitutional due process rights.  Therefore, Defendants Barajas and Esberg's motion for summary judgment as to Plaintiff's due process claim is GRANTED.

**4.     Analysis of Due Process Claim Regarding Plaintiff's Housing Against Defendants Mitchell and Bauman in a Supervisory Capacity**

Plaintiff's unverified original complaint alleges that he wrote letters to Defendants Mitchell and Bauman to inform them that he was "illegally" being held in maximum security as a "political prisoner" by the Lake County Jail staff.  (Compl. at 15-16.)  Plaintiff did not receive a response.  (Id. at 16.)  Therefore, Plaintiff alleges both Defendants Mitchell and Bauman violated his constitutional rights while acting in their official capacity as supervisors.  (Id.)

A supervisor may be liable under 42 U.S.C. § 1983 upon a showing of (1) personal

36

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Redman, 942 F.2d at 1446.  However, a supervisor cannot be held liable under § 1983 in the absence of an underlying constitutional violation.  Jackson, 268 F.3d at 654.  Also, a supervisor therefore generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

While Plaintiff provides no evidence that Defendants Mitchell and Bauman were aware of Plaintiff's predicament or of his letters, until this lawsuit was filed, the Court takes the facts in the light most favorable to Plaintiff and finds that the record supports Plaintiff's assertion that Defendants Mitchell and Bauman could be held liable in their supervisory capacity because they had knowledge of the alleged violations.  See Taylor, 880 F.2d at 1045.  However, as discussed above, the Court has already granted summary judgment as a matter of law for claims again their subordinates, Defendants Barajas and Esberg, upon finding that Plaintiff's re-housing in maximum security from October 10, 2003 through March 25, 2004 did not violate his constitutional due process rights.  Therefore, Plaintiff has failed to produce sufficient evidence regarding an essential element of his claim, i.e., an underlying constitutional violation.

Accordingly, Defendants Mitchell and Bauman are entitled to summary judgment as a matter of law, and their motion for summary judgment as to Plaintiff's due process claim is GRANTED.

**E.**     **Retaliation Claims Against Defendants Efestione and Hauff**

In his unverified amendment to the complaint, Plaintiff alleges that Defendants Efestione and Hauff violated his constitutional rights by retaliating against him for filing inmate grievances while

incarcerated.

### 1.    **Factual Background**

#### a.    **Defendant Efestione's Version**

Defendant Efestione filed a write-up concerning Plaintiff's actions when she was assigned to work the tower of the Lake County Jail on April 23, 2003. (Efestione Decl. ¶ 4.) Plaintiff returned to his cell and had the door propped partially open. Plaintiff was not wearing any clothes, and he was masturbating. The write-up charged Plaintiff with violating the Uniform Code of Prisoners' Conduct, specifically: Major Rule 202 (Inmates will show respect to jail staff at all times); Major Rule 221 (Inmates will not expose themselves to other inmates, civilians or jail staff); Major Rule 227 (Inmates will not engage in sexual acts or make sexual threats or proposals to other inmates or jail staff); Minor Rule 301 (Inmates will not engage in conduct that interferes with or disrupts the orderly running of the jail); and Minor Rule 310 (Inmates will not use item for anything other than its intended use). (Esberg Decl. ¶ 6c, Ex. E1.) Plaintiff was given an "Inmate Rights at Hearing" form relating to the charges on this write-up, the receipt of which Plaintiff acknowledged by his signature. (Esberg Decl. ¶ 6c, Ex. E2.) As of the date of the aforementioned write-up, Defendant Efestione was not aware of any inmate grievances or complaints made by Plaintiff. (Esberg Decl. ¶ 6.)

The disciplinary charges against Plaintiff were heard by the Board on April 27, 2003. The Board found Plaintiff guilty of all charges, except for Minor Rule 301. (Esberg Decl., Ex. E4.) Plaintiff was placed in disciplinary lockdown for ten days from April 28, 2003 to May 7, 2003. (Id.) During this time, Plaintiff was not allowed to purchase nor possess any commissary with the exception of writing and hygiene materials. (Id.) Plaintiff's phone privileges were also limited to legal purposes only. (Id.)

38

**United States District Court**
For the Northern District of California

### b.     Defendant Hauff's Version

On July 16, 2003, Defendant Hauff was working as one of the officers for Units A through E at the Lake County Jail.  (Hauff Decl. ¶ 4.)  Plaintiff was housed in Pod B at this time.  On this date, Plaintiff repeatedly exposed his genitalia to Defendant Hauff.  (Id.)  Defendant Hauff prepared a write-up charging Plaintiff with violating Major Rule 201 (Inmates will show respect to jail staff at all times) and Major Rule 221 (Inmates will not expose themselves to other inmates, civilians or jail staff).  (Id.)  As of the date of the write-up, Defendant Hauff was not aware of any inmate grievances or complaints made by Plaintiff generally or specifically relating to Defendant Hauff.  (Id. ¶ 5.)

### c.     Plaintiff's Version

According to Plaintiff's unverified amendment to the complaint, Defendant Efestione wrote a false and fabricated write-up against him for the actions which occurred on April 23, 2003 and on June 23, 2003, in retaliation for his numerous complaints and inmate grievances.  He also claims that, for the same reason, Defendant Hauff retaliated against him by writing a false and fabricated write-up against him for the actions which occurred on July 16, 2003.  At the time of receiving these three write-ups, Plaintiff understood that he was only charged with major and minor jail rule violations that would remain only on his jail record.  He claims the write-ups were not forwarded to the Lake County District Attorney's Office for prosecution on three counts of misdemeanor indecent exposure pursuant to the California Penal Code § 314.1.

### 2.     Applicable Law

Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  Retaliation, though it is not expressly referred to in the Constitution, is actionable because retaliatory actions may tend to

chill individuals' exercise of constitutional rights.  See Perry v. Sindermann, 408 U.S. 593, 597

(1972).

> Within the prison context, a viable claim of First Amendment retaliation
> entails five basic elements:  (1) An assertion that a state actor took some adverse
> action against an inmate (2) because of (3) that [inmate's] protected conduct, and
> that such action (4) chilled the inmate's exercise of his First Amendment rights,
> and (5) the action did not reasonably advance a legitimate correctional goal.

Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted); accord Pratt v.

Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (A prisoner suing prison officials under § 1983 for

retaliation must allege that he was retaliated against for exercising his constitutional rights and that

the retaliatory action did not advance legitimate penological goals, such as preserving institutional

order and discipline.); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985) (contention that actions

were "arbitrary and capricious" sufficient to allege retaliation).

An inmate must at least allege that he suffered harm, since harm that is more than minimal

will almost always have a chilling effect.  Rhodes, 408 F.3d at 567-68 n.11; Resnick v. Hayes, 213

F.3d 443, 449 (9th Cir. 2000) (holding that a retaliation claim is not actionable unless there is an

allegation of harm).  The inmate need not demonstrate a total chilling of his First Amendment rights

in order to establish a retaliation claim.  See Rhodes, 408 F.3d at 568-69 (rejecting argument that

inmate did not state a claim for relief because he had been able to file inmate grievances and a

lawsuit).  Instead, the plaintiff must show that the defendant's actions against him "would have

chilled or silenced 'a person of ordinary firmness from future First Amendment activities.'"  White v.

Lee, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting Mendocino Envtl. Ctr. v. Mendocino County, 192

F.3d 1283, 1300 (9th Cir. 1999)).

The inmate must show that the type of activity he was engaged in was constitutionally

protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory

action, and that the retaliatory action advanced no legitimate penological interest.  Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997) (inferring retaliatory motive from circumstantial evidence).[5] A retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.  Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

The inmate bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains.  Pratt, 65 F.3d at 806.  At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose.  See Schroeder v. McDonald, 55 F.3d 454, 461-62 (9th Cir. 1995) (defendants had qualified immunity for their decision to transfer prisoner to preserve internal order and discipline and maintain institutional security).

Retaliation claims brought by inmates must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  Pratt, 65 F.3d at 807 (quoting Sandin, 515 U.S. at 482).  In particular, courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment."  Sandin, 515 U.S. at 482 (quoting Wolff, 418 U.S. at 561-63).

### 3.   **Analysis**

To overcome summary judgment, Plaintiff must show a triable issue is supported by proof that Defendants Efestione and Hauff prepared the write-ups in retaliation for Plaintiff's exercise of his constitutional rights, that the write-ups chilled Plaintiff's First Amendment rights, and that the

---

[5]  A plaintiff (inmate or not) need not show that the retaliatory action taken in response to his constitutional rights independently deprived him of a constitutional right.  See, e.g., Franco v. Kelly, 854 F.2d 584, 585-86 (2d Cir. 1988) (false disciplinary charges filed against prisoner for cooperating with state investigation stated retaliation claim despite no right to be free from false charges).  But, as noted above, the plaintiff must allege and show that the defendants' actions chilled the First Amendment rights of a person of reasonable firmness.  See White, 227 F.3d at 1228.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

alleged retaliatory action advanced no legitimate penological interest.  See Rhodes, 408 F.3d at 567-68.

As a threshold matter, Plaintiff has established as a matter of law that his conduct -- the filing of multiple grievances -- meets the core requirement of the retaliation analysis, that is, that it is constitutionally protected under the First Amendment.  See Prison Legal News v. Cook, 238 F.3d 1145, 1149 (9th Cir. 2001) (A prisoner retains those First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." (internal quotation marks and citation omitted)).

The record shows that Defendants Efestione and Hauff cited Plaintiff for rule violations on different occasions for exposing his genitals and publicly masturbating.  (Efestione Decl. ¶¶ 4, 5, Hauff Decl. ¶ 4.)  At the time of reporting these infractions, Defendants Efestione's and Hauff's verified declarations state that they were unaware of any inmate grievances filed by Plaintiff, including any grievances against them.  (Efestione Decl. ¶ 6, Hauff Decl. ¶ 5.)  Plaintiff does not submit any evidence disputing the verified declarations of Defendants Efestione and Hauff that they did not know about Plaintiff's grievances prior to issuing the write-ups.  There is also no dispute that any inmate grievance filed by Plaintiff prior to Defendants Efestione's and Hauff's write-ups related to or complained about any actions by either officer.  Therefore, Plaintiff cannot establish a casual link between the filing of inmate grievances and Defendants Efestione's and Hauff's write-ups.

Furthermore, the evidence presented by Plaintiff does not lend itself to the inference that Defendants Efestione's and Hauff's actions were taken because of Plaintiff's protected conduct and not for a legitimate penological purpose.  The Lake County Jail has established inmate disciplinary procedures and policies to insure that inmates adhere to certain minimal standards.  Included in these minimal standards are behavioral expectations that inmates will show respect towards correctional

officers and, in this case, that inmates will refrain from exposing their genitals to other inmates, civilians or jail staff.  Enforcement of these minimal standards serves legitimate goals of maintaining jail security, safety and control.  By citing inmates for conduct which falls below these minimal standards and issuing write-ups, jail officers, such as Defendants Efestione and Hauff, achieve these goals for the benefit of the entire jail.

Finally, the Court finds that Plaintiff has failed to show that Defendants Efestione's and Hauff's write-ups would have chilled the protected speech of a person of reasonable firmness.  The record shows that Plaintiff's First Amendment rights were not chilled because he submitted at least eighty inmate grievances between July 16, 2003 and October 4, 2004, which includes the time frame following Defendants Efestione's and Hauff's write-ups.  (Esberg Decl. in Supp. of Def. Hauff's Mot. for Summ. J. ¶ 7.)[6]  However, the Court looks to whether an objectively reasonable person of ordinary firmness would have his or her First Amendment rights chilled by Defendants Efestione's and Hauff's actions.  Here, the Court finds that a reasonable person of ordinary firmness in Plaintiff's same or similar circumstances would not have been deterred from pursuing grievances after receiving Defendants Efestione's and Hauff's write-ups.

Accordingly, Defendants Efestione's and Hauff's motions for summary judgment as to Plaintiff's retaliation claim are GRANTED.

**F.     Supervisory Liability Claim Against Defendant Riedle**

Also, in his unverified amendment to his complaint, Plaintiff alleges supervisory liability against Defendant Riedle relating to the claim against Defendants Russell and Bierman for excessive force and to the claim against Defendant Russell for deliberate indifference to serious medical needs.

---

[6]  The Court notes that Defendant Esberg has submitted two verified declarations, one in support of her motion for summary judgment (docket no. 88) and the other in support of Defendant Hauff's motion for summary judgement (docket no. 121).  Prior to this cite, the Court has only cited to Defendant Esberg's declaration in support of her own motion.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. Factual Background

#### a. Defendant Riedle's Version

As a sergeant, Defendant Riedle's responsibilities included supervision of approximately twelve to sixteen correctional officers assigned to the jail and approximately 300 inmates housed therein. (Riedle Decl. ¶ 2.) On April 22, 2003, Defendant Riedle became aware of Defendant Russell's intention to remove Plaintiff from his cell to the booking area. Defendant Riedle approved Defendant Russell's approach and gathered up other officers to provide back-up to Defendants Russell and Bierman as they removed Plaintiff from his cell. Defendant Riedle was present in the vicinity of Plaintiff's cell at the time he was removed. Defendant Riedle had no physical contact with Plaintiff. (Id. ¶ 3.)

At no time did Defendant Riedle direct, participate in, encourage or become aware of any excessive force used against Plaintiff during the April 22, 2003. (Id. ¶ 4.) Plaintiff did not express or exhibit to Defendant Riedle any injury, a need for any medical attention, nor a need for treatment of any condition related to the incident. (Id. ¶ 6.)

#### b. Plaintiff's Version

According to Plaintiff's unverified amendment to the complaint, on April 22, 2003, Plaintiff claims that Defendant Riedle was one of two sergeants who led a squad of backup correctional officers to Plaintiff's cell at the request of Defendant Russell. When Defendant Riedle arrived at Plaintiff's cell, she ordered and allowed Defendants Russell and Bierman to enter the cell and use excessive force against Plaintiff. As a jail supervisor, Defendant Riedle did nothing to stop Defendants Russell and Bierman from using excessive force against Plaintiff. Defendant Riedle also denied Plaintiff medical and mental health treatment following the incident.

### 2. Applicable Law

The standard for supervisory liability is set out above.

3.    **Analysis**

The record shows that Defendant Riedle approved Defendant Russell's plan to escort Plaintiff out of Pod C.  (Riedle's Decl. ¶ 3.)  She also gathered correctional officers to provide backup for Defendant Russell as he removed Plaintiff from his cell.  (Id.)

The Court takes the facts in the light most favorable to Plaintiff and finds that the record supports Plaintiff's assertion that Defendant Riedle could be held liable in her supervisory capacity because she had knowledge of the alleged violations.  See Taylor, 880 F.2d at 1045.  Plaintiff's cause of action against Defendant Riedle, however, requires a factual showing that:  (1) Defendants Russell and Bierman used excessive force against Plaintiff and Defendant Russell was deliberately indifferent to Plaintiff's medical needs, and (2) that Defendant Riedle was personally involved in these constitutional violations.  First, as discussed above, Plaintiff does not provide sufficient evidence under Graham that his due process rights were violated by Defendants Russell and Bierman.  Secondly, the Court has also found above that Plaintiff has failed to raise a triable issue of material fact that he suffered a serious medical need after the April 22, 2003 incident or that Defendant Russell acted with deliberate indifference.  Thus, the undisputed evidence demonstrates no constitutional violations against her subordinates, Defendants Russell and Biermann.  Therefore, Plaintiff has failed to produce sufficient evidence regarding an essential element of his claim, i.e., an underlying constitutional violation.  Accordingly, the Court finds that Defendant Riedle was not liable, as a supervisor, for excessive force against Plaintiff or deliberate indifference to his serious medical needs.  Therefore, Defendant Riedle's motion for summary judgment as to Plaintiff's supervisory liability claim is GRANTED.

**IV.    Other Defendants' Qualified Immunity Defenses**

In the alternative, Defendants Brown, Young, Porter, Mitchell, Esberg, Barajas, Bauman, Sestito, Efestione, Hauff and Riedle claim that they are entitled to summary judgment on all claims

45

**United States District Court**
For the Northern District of California

against them based on qualified immunity.[7]  The standard for consideration of qualified immunity is set out above.

The Court has already found that the aforementioned Defendants' actions do not rise to the level of a constitutional violation as to any of Plaintiff's claims.  However, even if Plaintiff's rights had been violated and his rights were clearly established at the time of the violation, aforementioned Defendants are entitled to qualified immunity because they have produced sufficient evidence showing that they could have believed that their actions were reasonable in the circumstances of each claim as outlined below.

First, Plaintiff alleges that Defendants Brown, Young and Porter violated his due process rights at the April 27, 2003 hearing.  Plaintiff argues that Defendants Brown, Young and Porter denied him the opportunity to present witnesses and be present during the hearing.  Again, only Defendant Porter claims qualified immunity because Defendants Brown and Young have not been served.  A reasonable jail official in Defendant Porter's position could have believed he would not violate a clearly established constitutional right if he were not to consider testimony from Plaintiff's witnesses after Plaintiff no longer wished to have these witnesses interviewed at the hearing.  Also, the undisputed facts show Plaintiff was present for the duration of his hearing.  Therefore, Defendant Porter is entitled to judgment as a matter of law on this due process claim based on his qualified immunity defense.

Second, Plaintiff alleges that Defendants Mitchell, Esberg, Barajas, Bauman and Sestito placed him in "solitary confinement" from October 10, 2003 to March 25, 2004 based on insufficient evidence, constituting a due process violation.  The record shows that the decision to re-house

---

[7]  The Court has already addressed Defendant Russell's claim of qualified immunity above.  Further, Defendants Lennon, Stottsberry and Fithian do not raise a qualified immunity defense in their motion for summary judgment.

**United States District Court**
For the Northern District of California

Plaintiff in maximum security by housing him in Pod B on October 10, 2003 was based on his classification as a "Level 4" maximum security inmate.  The record further shows that Plaintiff retained his maximum security status after displaying a history of misbehavior towards jail staff and his fellow inmates, that Plaintiff had the opportunity to contest his classification and placement, and that his classification and placement were reviewed periodically.  Thus, in view of these facts and the state of the law, a reasonable jail official in Defendants Mitchell's, Esberg's, Barajas's, and Bauman's position could have thought that Plaintiff's re-housing to Pod B, under the circumstances of this case, would not violate a clearly established constitutional right.  Therefore, Defendants Mitchell, Esberg, Barajas, and Bauman are entitled to judgment as a matter of law as to Plaintiff's due process claim based on their qualified immunity defense.

Third, Plaintiff alleges that Defendants Efestione and Hauff violated his constitutional rights because both retaliated against him for filing inmate grievances while incarcerated.  A reasonable jail official in Defendants Efestione's and Hauff's position could have thought reporting Plaintiff's rule violations was justified due to Plaintiff's continual failure to follow jail regulations by exposing himself to female officials.  Also, the undisputed facts show that neither Defendant knew Plaintiff was filing inmate grievances prior to reporting his violations.  Therefore, Defendants Efestione and Hauff are entitled to judgment as a matter of law as to Plaintiff's retaliation claim based on their qualified immunity defense.

Finally, Plaintiff argues that Defendant Riedle was liable as a supervisor for Defendants Russell's and Bierman's alleged use of excessive force and was deliberately indifferent to Plaintiff's serious medical needs, constituting a due process violation.  Plaintiff has not shown that Defendant Riedle's behavior was unreasonable from the perspective of a jail official in her situation.  A reasonable jail official in Defendant Riedle's position could have thought her actions were justified because Plaintiff did not express or exhibit any injury nor the need for any medical attention or

47

**United States District Court**
For the Northern District of California

treatment for any condition relating to the April 22, 2003 incident.  Also, the undisputed facts show that Defendant Riedle neither directed the use of excessive force on Plaintiff nor allowed Defendants Russell and Bierman to use excessive force against Plaintiff.  Therefore, Defendant Riedle is entitled to judgment as a matter of law as to Plaintiff's supervisory liability claim based on her qualified immunity defense.

## V.     Unserved Defendants

Summary judgment may be properly entered in favor of unserved defendants where (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have been briefed, and (3) Plaintiff has been provided an opportunity to address the controlling issues.  Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 802-03 (9th Cir.) (citing, inter alia, Silverton v. Dep't of the Treasury, 644 F.2d 1341, 1345 (9th Cir 1981)), cert. denied, 516 U.S. 864 (1995).

As mentioned above, some Defendants have not been served and have not joined the other Defendants in their motions for summary judgment.  The unserved Defendants in this case are Defendants Bierman, Brown, Young and Sestito.  It is apparent, however, that the claims against the unserved Defendants are without merit and subject to summary adjudication.  The allegations against the unserved Defendants in Plaintiff's original complaint are the same as those against the served Defendants.  Plaintiff's excessive force allegation against Defendant Bierman is the same claim as against Defendant Russell.  Likewise, Plaintiff's due process claim against Defendants Brown and Young is the same claim as against Defendant Porter, and Plaintiff's due process claim against Defendant Sestito is the same claim as against Defendants Esberg and Barajas.  There is no suggestion in the complaint, the exhibits attached thereto, or in the briefs and exhibits filed in connection with the present motions, that the analysis differs with respect to the unserved Defendants as opposed to the served Defendants.  Accordingly, Defendants Bierman, Brown, Young

48

1   and Sestito are entitled to summary judgment as a matter of law.

2                                              **CONCLUSION**

3         For the foregoing reasons, the Court GRANTS Defendants' motions for summary judgment

4   (docket nos. 87, 111, 120, 153, 157).  The Clerk of the Court shall enter judgment in favor of

5   Defendants, terminate all pending motions,[8] and close the file.  This Order terminates Docket nos.

6   87, 103, 105, 106, 111, 120, 125, 126, 129, 152, 153 and 157.

7         IT IS SO ORDERED.

8   DATED: March 31, 2008

9                                                          *Saundra B Armstrong*

10                                                         SAUNDRA BROWN ARMSTRONG
                                                          United States District Judge

---

23        [8] Plaintiff has filed motions for leave to file an amended complaint.  In considering whether to
    grant or deny a motion seeking leave to amend a complaint, the Court may consider whether there is bad
24  faith, undue delay, prejudice to the opposing party, futility in the amendment, and whether Plaintiff has
    previously amended his complaint.  See Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir.
25  1990).  The Court finds that Plaintiff has not shown that justice requires that he be permitted to further
    amend his pleading.  Plaintiff has never explained why he had waited so long to add his new claims, or
26  why he had not included them in his prior amendment.  Therefore, Plaintiff's motions for leave to file
    an amended complaint (docket nos. 105, 106) are DENIED.
27        Plaintiff's remaining pending motions, including his motions relating to locating unserved
    Defendants (docket nos. 103, 125, 126, 129, 152), are TERMINATED as moot because the Court has
28  found that the unserved Defendants Bierman, Brown, Young and Sestito are entitled to summary
    judgment as a matter of law.

1

2   UNITED STATES DISTRICT COURT

3   FOR THE

4   NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8   SEALS,                                    Case Number: CV04-01569 SBA

9           Plaintiff,                        **CERTIFICATE OF SERVICE**

10      v.

11  RUSSELL et al,

12          Defendant.
    _____/

13

14

15  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.

16

17  That on April 11, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
    located in the Clerk's office.

18

19

20

21

22  Michael Izell Seals V77488
    California State Prison - San Quentin
23  San Quentin,  CA 94974

24

25  Dated: April 11, 2008

26                                            Richard W. Wieking, Clerk
                                              By: LISA R CLARK, Deputy Clerk

27

28

United States District Court
For the Northern District of California